# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche Manning | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1936 | **DATE** | 8/28/2003 |
| **CASE TITLE** | Petra Presbyterian Church vs. Village of Northbrook | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Report and Recommendation, Petra's motion for preliminary injunction [3-1] should be denied. In addition, The Village of Northbrook's motion to withdraw constitutionality challenge without prejudice [17-1] should be denied as moot, and Petra's oral motion to have the court drive by the property should also be denied. Counsel has ten days from the date of service of this court's report and recommendation to file objections with the Honorable Blanche M. Manning.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 2 9 2003 | |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | | 3 |
| ✓ | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | date mailed notice | |
| hmb6 | courtroom deputy's initials | | | |

U.S. DISTRICT COURT
CLERK
03 AUG 28 PM 3:19

Date/time received in
central Clerk's Office          mailing deputy initials

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PETRA PRESBYTERIAN CHURCH,   )
  )
      Plaintiff,   )
  )
vs.   )     **Case No. 03 C 1936**
  )
VILLAGE OF NORTHBROOK,   )
  )
      Defendant.   )

**DOCKETED**

AUG 2 9 2003

## REPORT AND RECOMMENDATION

NAN R. NOLAN, Magistrate Judge:

    Plaintiff Petra Presbyterian Church ("Petra") seeks a preliminary injunction prohibiting defendant Village of Northbrook (the "Village") from enforcing a zoning ordinance that bans worship services at certain property owned by Petra. The motion was referred to this Court for an evidentiary hearing and a Report and Recommendation as to whether the motion should be granted. In making its recommendation on this matter, the Court has considered the facts and documents set forth in the complaint and the parties' briefs and submissions, as well as the witness testimony and exhibits presented at a hearing on June 23 and continued on June 24 and 25 and July 18, 2003. For the reasons set forth below, the Court recommends that Petra's motion for a preliminary injunction be denied.

## FACTUAL BACKGROUND

    Petra was chartered as an Illinois not-for-profit corporation in 1994. Its congregation is a member of Midwestern Presbyterian Churches, an association of mostly Korean churches, and it

31

is undisputed that the religious beliefs of Petra's 175 members are sincere. Tr. 85-86, 157, 173. The Village is an Illinois municipal corporation.

## A.    The Zoning Code

The Village of Northbrook Zoning Code dates back to 1964 but was substantially amended in 1988. The 1988 Code identified 24 separate districts within Northbrook, including eight residential districts (R-1 to R-8), five commercial districts (C-1 to C-5), five office districts (O-1 to O-5), two industrial districts (I-1 and I-2) and an institutional buildings district (IB). The Village adopted the federal government's Standard Industrial Classification System, which is a system of classifying the various types of land uses. The Village then determined whether each type of land use was permitted as of right, permitted with a special permit, or not allowed at all in each district. *See, e.g.*, PX 4; Tr. 219-20, 244, 262-63. Northbrook is largely developed and special permits allow the Village to regulate land use to preserve the character of a particular area and to protect the public health and safety. Tr. 245, 317-18, 333, 401-03; Pl. Mem., Ex. B. According to Thomas Poupard, the Village's Director of Community Planning, the Board of Trustees (the "Board") has very limited discretion to deny a special permit. In his view, if a particular use is allowed in a district with a special permit, that use is presumed to be valid unless the Village demonstrates that it will have an adverse effect on the neighborhood or public health and safety. Tr. 289-90, 303, 321-22, 331-32. Nevertheless, he conceded that under the terms of the zoning code, the applicant appears to bear the burden of demonstrating that a particular use is valid. Tr. 432, 434-35; PX 2, 2d Supp.

Under the 1964 Code, religious organizations were allowed as of right in residential districts but could not be located in any business or manufacturing districts. In 1985 or 1986, the

2

Village added a requirement that religious organizations obtain a special permit in order to locate in the residential districts. Tr. 294-95. When the Village amended the ordinance in November 1988, it excluded religious organizations from all districts except the IB (institutional buildings) zone. The IB zone did not exist under the 1964 Code but was created to accommodate such facilities as libraries, schools, and public, semi-public and religious institutions. Facilities that were occupied by these organizations prior to the 1988 amendment were re-designated as IB zones and allowed to remain as legal, nonconforming uses in any districts that had otherwise become unavailable to them under the amended code. *See* PX 4; Tr. 296-97, 482. The only other way to create an IB zone was to apply for rezoning of the property in question. Thus, under the 1988 Code, a religious organization seeking to operate within Northbrook for the first time had to (1) seek rezoning of the property to IB, and (2) obtain a special permit from the Village. Tr. 320, 325-26, 426.

Unlike religious organizations, all other membership organizations were allowed as of right in five commercial districts (C-1 to C-5), three office districts (O-2 to O-4) and one industrial district (I-1 Restricted Industrial), and were allowed with a special permit in a fourth office district (O-5). They could also apply to rezone property as IB. PX 4. According to Poupard, other membership organizations were allowed in the particular I-1 district at issue here – Sky Harbor Industrial Park – to accommodate union halls, chambers of commerce and other organizations that would complement area businesses. Tr. 335-36. However, organizations such as community centers, youth groups, and art, music and language schools, which arguably do not complement the neighborhood industry, were also allowed in that district. Tr. 425.

3

**B.     Petra's Search for Property**

Prior to October 2001, Petra did not own any property and, thus, rented space in other churches to conduct its worship services, marriage ceremonies, baptisms and other religious activities. Petra first rented space at the United Methodist Church in Chicago but in 1997 or 1998, it moved to the Holy Trinity Lutheran Church in Glenview, Illinois (the "Lutheran Church"). Tr. 30, 56-57. Petra conducts worship services at the Lutheran Church on Sunday afternoons and has also used the facility for weddings, baptisms, bible studies and retreats, subject to the Lutheran Church's schedule. In exchange, Petra makes a monthly offering to the church of $500 and assists with repairs and other maintenance and improvement projects. Tr. 32-34, 55, 57, 61, 96, 102-03, 108, 165.

Beginning in 1995, Petra began searching for a building of its own. It formed a six-member committee responsible for finding an appropriate property and started a fundraising campaign to help finance the purchase. However, Petra was unable to find an existing church for sale in the desired location and at the right price. Tr. 34-36, 38. Petra ultimately hired a professional real estate agent to assist with the search. Tr. 38.

**C.     The Property**

In September 2000, Petra found 3005 MacArthur Boulevard in Northbrook (the "Property"), an approximately four-acre parcel with a large office building and an adjacent open-span building formerly used as a warehouse. Cmplt. ¶2. The Property is located within Sky Harbor Industrial Park, a T-shaped area of land in northwest Northbrook that is an I-1 district consisting mainly of offices and manufacturing facilities. The buildings surrounding Petra house various businesses, including a grinding, polishing and stamping business, a tool and die

4

company, a heating and air conditioning company, an electrical contractor, a plumbing company and a laboratory. Tr. 115, 192-93, 200-01. These businesses utilize such materials as abrasives, lasers, and flammable liquids and chemicals. Tr. 273-79. Large semi-trucks drive through the area to pick up and drop off materials, though there was no clear testimony as to the frequency of this activity. Sky Harbor is bordered by residential districts on approximately half of its perimeter and is adjacent to a school for children in kindergarten through eighth grade. Tr. 255-56, 257-58. According to Wayne Hansen, the Village's Director of Development, these areas are separated from Sky Harbor by buffers, screening, and landscaping. Tr. 190, 194, 265-66. Sky Harbor also has numerous picnic tables and a few leisure areas, presumably for use by area employees and factory workers. Tr. 136, 141-43, 253, 255-56.

Petra had several meetings with its realtor to discuss the possibility of rezoning the Property from I-1 to IB as required by the 1988 Code, and hired an attorney specializing in zoning law to assist with the process. Tr. 43-44, 391. On September 29, 2000, Petra requested preliminary comments from the Board on its application for rezoning of the Property. On October 10, 2000, the Board conducted a preliminary review of Petra's application and shortly thereafter on December 3, 2000, Petra entered into a contract to purchase the Property for $2.9 million. The contract included a zoning contingency clause that allowed Petra to terminate the contract if it did not obtain the required rezoning. Tr. 46.

The Village's Plan Commission held public hearings on the rezoning issue on February 20 and April 3, 2001. PX 12, 13. Based on discussions with, and comments from the Plan Commission, Petra submitted a list of 13 conditions it agreed to follow in using the Property, including limiting its occupancy rates and landscaping the premises. On April 17, 2001, the Plan

Commission recommended against approving Petra's application, concluding that Petra required too many restrictions to be a successful operation in the I-1 district. Tr. 381-87, 458-65; PX 7, 2d Supp. On May 8, 2001, the Board considered Petra's rezoning application and asked the Village staff to prepare documents relating to a denial of the application. Before the Board had a chance to take any formal action on the rezoning, however, Petra withdrew its application on the advice of its realtor and attorney. DX 6; Tr. 47, 73, 117, 388-90.

In addition to withdrawing its rezoning application, Petra also exercised its option to terminate the contract. In September 2001, however, Petra revived the contract, this time without a zoning contingency, and agreed to purchase the Property for $2.6 million – $300,000 less than the original purchase price.[1] Tr. 74, 117. Petra closed on the Property on October 8, 2001.

## D.    The Amendments to the Ordinance

In or about June 2001, the Village began the process of reviewing the zoning regulations governing religious and membership organizations within Northbrook. DX 1. On October 30, 2001, the Plan Commission and the Community Relations Commission held a joint meeting on the issue, and it went before the Board on a preliminary review in April 2002. Tr. 340. The Village held public workshops to discuss proposed amendments to the Zoning Code on October 15, November 5 and November 19, 2002, and held three additional public hearings on December 3, 2002 and January 7 and 21, 2003. DX 1; Tr. 340. Members of the clergy were invited to attend all of the hearings and workshops and Petra representatives were present for most or all of them. Tr. 340-41.

---

[1]    In its First Amended Complaint, submitted on August 4, 2003, Petra claims that the final purchase price was $2.4 million. Amend. Cmplt. ¶7.

At the hearing on January 21, 2003, the Plan Commission recommended approval of amendments to the 1988 Code. DX 1; Tr. 342. The Board received the Plan Commission's recommendations on February 11, 2003 and referred them to the Planning and Zoning Committee, which reviewed them on February 25, 2003. Petra representatives attended the February 25 meeting but did not make any comments regarding the proposed amendments. Tr. 341-42. On April 22, 2003, the Board approved and adopted the amendments. Under this revised April 2003 Code, religious organizations are permitted as of right in two residential districts (R-1 and R-2), and can locate in 16 additional districts with a special permit (R-3 to R-8, C-1 to C-3, C-5, O-2 to O-5, IB and RLC). Other membership organizations are allowed in 10 districts with a special permit (C-1 to C-3, C-5, O-2 to O-5, IB and RLC). Tr. 311-12, 327-28. Poupard testified that the Village decided to exclude all membership organizations from the I-1 district because it determined that none of the organizations was appropriate in an industrial zone. Tr. 345, 545-46. Non-religious membership organizations already within the I-1 district, however, were allowed to stay as legal, nonconforming uses. Tr. 345, 348-49, 479; PX 9.

On June 12, 2003, the Village discovered what it calls "scrivener's errors" in the April 2003 Code. Specifically, the Village neglected to (1) prohibit Membership and Sports and Recreation Clubs in the C-4, I-1 and I-2 districts; (2) prohibit Physical Fitness Facilities in the I-1 district; and (3) provide that Membership and Sports and Recreation Clubs are a special permit use in the Open Space (OS) and IB districts. Petra makes much of the fact that it highlighted these inconsistencies for the Village in its June 3, 2003 Trial Brief and that the Board passed the April 2003 amendments as written. In any event, on June 16, 2003, the Board passed a

7

supplemental amendment to the zoning code, retroactively effective on May 3, 2003, reflecting the above changes. DX 2; Tr. 506-11, 516.

## E. Petra's Use of the Property

Deacon David Lee, Ruling Elder Suk Keun Kim, and Pastor Seung-Hun Kim all testified regarding the activities Petra conducts at the Property, which bears the sign "Petra Mission Center." Tr. 177. They each stated that Petra has been holding bible studies, prayer meetings and choir practices at 3005 MacArthur since the October 2001 closing date. Tr. 49-51, 52-53, 90-93, 94-95, 166-68, 185. In earlier depositions the witnesses indicated that Petra was not using the Property for anything but an office; however, the Court notes that English is not the witnesses' first language and credits the testimony offered at the hearing on this issue. In any event, Petra admits that it does not have a permit to conduct these religious activities. Tr. 184, 185. Village Director of Development Hansen testified that a permit is required because the religious activities are not accessory uses to office space, which is the Property's principal use. Tr. 217-18, 393-94. The Village first learned that Petra is conducting bible studies, prayer meetings and choir practices at the Property during the June 2003 hearing. Tr. 207-08, 352, 406.

Petra is not the only organization using the Property. Salitek, a media broadcasting company, Lee & Lee Group, Korean Christian TV Broadcast, and the Milal Mission for disabled persons all operate out of 3005 MacArthur, rent free. Tr. 65-66, 81, 164, 166, 169, 172, 178-79. Petra does not have a permit to conduct programs for the disabled. Tr. 184.

On May 4, 11 and 18, 2003, Petra held Sunday worship services at 3005 MacArthur for the first time since its purchase. Tr. 53-54, 70, 118-19. On May 16, 2003, the Village notified Petra that it was violating the Village's building code by having so many people on the premises.

Petra held services in its 238-space parking lot on May 25 and June 1, 2003 but ultimately returned to the Lutheran Church as of June 15, 2003. Tr. 55-56, 119, 209. On or about June 18, 2003, the Circuit Court of Cook County entered a preliminary injunction preventing Petra from using the Property for Sunday worship services because the Property did not comply with applicable building codes for such high occupancy rates. Tr. 119-21.

## F.    Petra's Lawsuit

On or about March 20, 2003, Petra sought a temporary restraining order to prevent the Village from enforcing its zoning code – at the time, the 1988 Code. Petra claims that the ordinance violates (1) the Equal Protection Clause (Count I), Free Exercise Clause (Count III), and First Amendment right of free speech (Count V) of the United States Constitution; (2) the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §2000cc, *et seq.* (Counts II and IV); and (3) the Illinois Religious Freedom Restoration Act ("RFRA"), 775 ILCS 35/15 (Count VI). The TRO was denied on March 20, 2003 and Petra's motion for preliminary injunction was referred to this Court for a hearing and a Report and Recommendation.

On August 4, 2003, Petra requested leave to file a First Amended Complaint, adding claims for recovery under the theories of vested rights (Count VII) and legal, nonconforming use (Count VIII). On August 6, 2003, the Court granted Petra's motion with respect to Count VIII without objection from the Village. The Village has not offered further objection to the addition of Count VII and, thus, both claims are also before the Court for review.

## DISCUSSION

A plaintiff seeking a preliminary injunction must show: (1) a reasonable likelihood of success on the merits; and (2) that it has no adequate remedy at law and will suffer irreparable harm if the preliminary injunction is not granted. *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, (7th Cir. 2002) (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). If the plaintiff satisfies these conditions, the Court must then consider (3) the irreparable harm the nonmoving party will suffer if preliminary relief is not granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties. *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992); *Jones v. InfoCure Corp.*, 310 F.3d 529, 534 (7th Cir. 2002). The Court then weighs all four factors seeking to "minimize the costs of being mistaken." *Abbott Laboratories*, 971 F.2d at 12.

## A.     Likelihood of Success

For purposes of this preliminary injunction, Petra seeks relief under the Equal Protection Clause of the Fourteenth Amendment, the First Amendment rights to free speech and free exercise of religion, RLUIPA, and the theories of vested rights and legal, nonconforming use.[2]

---

[2]     Petra's only mention of its RFRA claim is a single, passing assertion that the 1988 Code violated §15 of the statute by excluding religious organizations from the I-1 districts which, in turn, substantially burdened Petra's use of its property. Pl. Post-Trial Mem., p. 11. This is wholly insufficient to justify any review of such a claim, much less to demonstrate a reasonable likelihood of success on it. *See Pacific Tall Ships Co. v. Kuehne & Nagel Inc.*, 102 F. Supp. 2d 923, 924-25 (N.D. Ill. 2000) ("we address only those [arguments] that are fully developed and supported by relevant case law"); *Ehrhart v. Secretary of HHS*, 969 F.2d 534, 537 n.5 (7th Cir. 1992) (a court "need not devote its time to discussion of an argument raised, if at all, in a very opaque manner") (citation omitted); *U. S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("[a] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments") (citation omitted).

Pl. Mem., p. 1; Mot. to Amend, Ex. A. Before turning to each claim, the Court first considers which version of the zoning code is properly at issue.

At the time Petra filed its lawsuit, the 1988 Code was in effect. During the course of this litigation, however, the Village twice amended the code to its current June 2003 form. Petra disputes that the amendments were proper, claiming that the zoning code's provision excluding religious organizations from the I-1 district was simply "null, void, and of no effect" because it violated statutory and constitutional laws. Pl. Mem., p. 5; Pl. Post-Trial Mem., pp. 2-3. In support of this argument, Petra relies on *Carter v. City of Salina*, 773 F.2d 251 (10th Cir. 1985), in which property owners sued to establish that their property could be used for commercial purposes despite a contrary zoning ordinance. The court found that the ordinance was void because the city failed to comply with state statutes requiring notice and hearing prior to enactment. Thus, the plaintiffs' property could be used for restaurant or other similar uses without interference from the city. *Id.* at 254. In this case, conversely, Petra does not argue that the Village failed to follow state laws or procedures in enacting the 1988 Code or the subsequent amendments. Thus, *Carter* does not establish that the 1988 Code, the fully amended 2003 Code, or any portion of those codes, is null and void.

Petra's reliance on *Hazel Wilson Hotel Corp. v. City of Chicago*, 17 Ill. App. 3d 415, 308 N.E.2d 372 (1974), is similarly misplaced. In *Hazel*, the plaintiff operated a shelter care home in a business district within the city of Chicago for nearly three years. At the time, there were no zoning regulations governing the location of such facilities. In August 1970, the city passed a non-cumulative amended ordinance that allowed shelter care homes in certain residential districts. The city thereafter denied the plaintiff's application for a license to operate the shelter

11

care home – submitted before the amended ordinance was enacted – on the grounds that such use was not permitted within the business district. *Id.* at 417, 308 N.E.2d at 374.

The court found that because the original ordinance made no provision whatsoever for shelter care homes, they were permitted to operate in any zoning area that was not incompatible with that use. 17 Ill. App. 3d at 419, 308 N.E.2d at 376. The plaintiff was legally operating its shelter care home in a business district prior to the amended ordinance, so the court held that it would be unconstitutional to retroactively deprive the plaintiff of that use. *Id.* at 419-20, 308 N.E.2d at 376. *Hazel* is clearly distinguishable from this case because the Village Zoning Code has expressly provided for religious use since its inception, but has never allowed such use in the I-1 district. Thus, nothing in *Hazel* supports Petra's theory that the zoning code, or any portion of it, is null and void.

When an ordinance is amended, the portion of a lawsuit seeking injunctive relief based on the old ordinance becomes moot. *See MacDonald v. City of Chicago*, 243 F.3d 1021, 1025 (7th Cir. 2001) ("[a]ny dispute over the 1997 version of the ordinance was mooted by the enactment of the new ordinance"); *Penny Saver Publications, Inc. v. Village of Hazel Crest*, 905 F.2d 150, 153 (7th Cir. 1990). Indeed, amendment is precisely the type of action that courts encourage to remedy an unlawful ordinance. *See, e.g., Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F. Supp. 2d 961, 979 (N.D. Ill. 2003) ("a simple amendment to the ordinance could readily solve Evanston's problem in a way that eliminates the unequal treatment"). Petra may still be able to pursue a declaratory judgment and a claim for damages suffered as a result of the allegedly unlawful 1988 Code. *See, e.g., Penny Saver*, 905 F.2d at 153 (plaintiff that could not seek injunctive relief under an amended ordinance "still has a viable claim for declaratory

12

and monetary relief"). *But see Civil Liberties for Urban Believers v. City of Chicago*, __ F.3d __, 2003 WL 21977001, at *6 n.6 (7th Cir. Aug. 20, 2003) (where the primary effect of amendments to a zoning ordinance was to "impose similar restrictions on non-religious assembly uses, rather than to relax restrictions on churches," churches' claim for damages under the old ordinance was moot). However, Petra's claims for preliminary injunctive relief are properly analyzed under the zoning code in its fully amended form.[3]

## 1. Equal Protection

The Equal Protection Clause mandates that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). "Equal protection limits the power of a legislature to target a particular individual, organization, or group by requiring that the legislature confer benefits or impose costs on a larger, neutrally defined group; it cannot pick on just the most vulnerable." *LC & S, Inc. v. Warren County Area Plan Comm'n*, 244 F.3d 601, 603 (7th Cir. 2001). The Supreme Court has established the following standards for determining the validity of state legislation, such as zoning codes, under the Equal Protection Clause:

> Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect classifications such as race, religion, or alienage, our decisions

---

[3]      The Court is not persuaded by Petra's suggestion that the second amendment in June 2003 was invalid or untimely because the Village enacted it only after Petra pointed out a remaining inconsistency in the ordinance with respect to the treatment of sports and recreation facilities. For purposes of this preliminary injunction, the Court credits the Village's explanation that its failure in April 2003 to preclude sports and recreation facilities in the I-1 district was merely an oversight in drafting which it sought to remedy in the June 2003 amendment. Def. Post-Trial Mem., p. 5; Tr. 361-67.

presume the constitutionality of the statutory discriminations and require only that
the classifications challenged be rationally related to a legitimate state interest.

*City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

If the legislative classification negatively affects such a suspect class, then courts may

uphold the classification only if it is "precisely tailored to serve a compelling governmental

interest." *Sklar v. Byrne*, 727 F.2d 633, 636 (7th Cir. 1984) (quoting *Plyler v. Doe*, 457 U.S. 202,

216-17 (1982)). Absent an invidious or gender-based classification, "[t]he general rule is that

legislation is presumed to be valid and will be sustained if the classification drawn by the statute

is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. With respect to

equal protection challenges in the municipal land use context, the Seventh Circuit Court of

Appeals has stated: "Absent a fundamental right or a suspect class, to demonstrate a viable equal

protection claim in the land-use context, the plaintiff must demonstrate 'governmental action

wholly impossible to relate to legitimate governmental objectives.'" *Forseth v. Village of

Sussex*, 199 F.3d 363, 370-71 (7th Cir. 2000).

Petra's Equal Protection Clause argument is based on the Village's 1988 Code, which

allowed non-religious membership organizations to operate in the I-1 district with a special

permit but prohibited religious organizations from doing so. Pl. Mem., pp. 5-6; Pl. Post-Trial

Mem., pp. 10-11. *See, e.g., Vineyard*, 250 F. Supp. 2d at 976-77 (ordinance that permitted

cultural and membership organizations within the O1 District but excluded religious

organizations classified on the basis of religion). As amended, however, the Village's zoning

code treats all religious and non-religious organizations the same with respect to the I-1,

commercial, and office districts. In fact, religious organizations are treated more favorably than

14

non-religious organizations in residential districts, where churches are allowed either as of right or by special permit but other membership institutions are not allowed at all. Tr. 311-12, 327-28.

In *C.L.U.B. v. City of Chicago*, 157 F. Supp. 2d 903 (N.D. Ill. 2001), a Chicago ordinance permitted clubs, lodges, meeting halls, recreation buildings, and community centers to locate in business and commercial districts as of right, but required churches to obtain a special use permit. *Id.* at 906. In response to the litigation, the city amended the ordinance to require that all of the entities, and not just churches, obtain a special use permit. In a subsequent ruling on summary judgment, the court applied the rational basis test, noting that the amended ordinance treated similar uses the same. *Id.* at 912. The Seventh Circuit Court of Appeals recently affirmed this decision, including the court's rational basis analysis. *Civil Liberties*, 2003 WL 21977001, at *10 (declining to apply heightened equal protection scrutiny because "[w]hatever obstacles that the [zoning code] might present to a church's ability to locate on a specific plot of Chicago land, they in no way regulate the right, let alone interfere with the ability, of an individual to adhere to the central tenets of his religious beliefs"). Following this rationale, the Village need only show a rational basis for the zoning code.

In amending the zoning code, the Village determined that churches are better suited for residential areas, and that membership organizations are not well-suited for industrial districts. Def. Mem., p. 5; Def. Post-Trial Mem., p. 16; Tr. 544-46. Thus, religious institutions are now permitted as of right in two residential districts, which arguably "recognizes the historical connection between strong and healthy residential communities and churches." *C.L.U.B.*, 157 F. Supp. 2d at 911-12; *Civil Liberties*, 2003 WL 21977001, at *10. In addition, religious institutions are allowed in commercial and office districts with a special permit. This allows

15

exceptions to the general rule that business and commerce may be hindered by non-commercial uses. *Id.* at 912; *Civil Liberties*, 2003 WL 21977001, at *10.

The Court recognizes that many other membership organizations remain in the I-1 districts despite the Village's stated safety concerns. However, these legal, nonconforming uses will presumably be eliminated over time. *See Littlejohn v. City of North Chicago*, 259 Ill. App. 3d 713, 721, 631 N.E.2d 358, 364 (1994) ("the spirit and intent of zoning is to restrict and eventually eliminate nonconforming uses") (internal quotation omitted). And Petra has not shown that the Village's action in excluding all membership organizations from the I-1 district rather than including religious organizations was "wholly impossible to relate to legitimate governmental objectives." *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003) (quoting *Forseth*, 199 F.3d at 371). As noted, churches are now treated the same as other non-religious organizations in I-1, commercial and office districts, and treated more favorably in residential districts. Thus, Petra has not shown a reasonable likelihood of success on its equal protection claim. *See Civil Liberties*, 2003 WL 21977001, at *10 (no equal protection violation where churches "fare better than many other nonreligious assembly uses that are treated equally in B, C, and M districts but excluded from R districts" that allow churches as of right).

### 2. Free Speech

Petra next claims that the Village's zoning code violates the congregation's right to free speech by excluding churches from the I-1 district. Cmplt. ¶31. The first question is whether a zoning code that limits the location of religious institutions regulates speech potentially protected by the U.S. Constitution or merely non-expressive conduct. Neither party has addressed this

issue. *Compare C.L.U.B.*, 157 F. Supp. 2d at 915 (denying free speech challenge to zoning ordinance on grounds that "operation of a house of worship does not equate with 'religious speech' any more than the operation of a shoe store equates with commercial speech"), with *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 468-71 (8th Cir. 1991) (zoning ordinance regulated speech because the "religious content of the [zoning] applicant's speech can determine whether the City permits it to locate in the [challenged] zone").

Assuming that the zoning code, which excludes both religious and non-religious membership organizations from the I-1 district, incidentally regulates speech within churches, it is content neutral because it is "motivated not by any disagreement . . . with the message conveyed by church speech or assembly, but by such legitimate, practical considerations as the promotion of harmonious and efficient land use." *Civil Liberties*, 2003 WL 21977001, at *9. Significantly, Petra has presented no evidence to suggest that the zoning code's purpose is to restrict religious speech in any way. In addition, the zoning code is narrowly tailored to serve a legitimate governmental objective. *See Ward v. Rock Against Racism*, 491 U.S. 781, 782 (1989). "There is no question that [Northbrook] – like any other population center – has a substantial interest in regulating the use of its land and that the [zoning code] promotes that interest." *Civil Liberties*, 2003 WL 21977001, at *9. Churches may freely disseminate religious speech in approximately 70 percent of Northbrook's area, either as of right or with a special permit. On these facts, it is not reasonably likely that Petra's free speech challenge will succeed.

### 3. Free Exercise

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const., amend. I. Petra argues that the zoning code violates its

right to free exercise of religion under the U.S. Constitution because Petra cannot conduct worship services or a variety of other religious activities at the Property. Pl. Mem., p. 8. The Free Exercise Clause, which applies to the states by incorporation into the Fourteenth Amendment, "prohibits local governments from making discretionary (i.e., not neutral, not generally applicable) decisions that burden the free exercise of religion, absent some compelling governmental interest." *C.L.U.B.*, 157 F. Supp. 2d at 914 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)). *See also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Under *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990), "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. Under *Lukumi*, a law is not "neutral" if "the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Id.* at 533. Before considering whether a law is neutral and/or generally applicable, however, a court must determine whether the law substantially burdens religious exercise. *Vineyard*, 250 F. Supp. 2d at 985 (citing *Lukumi*, 508 U.S. at 531).

Petra claims that it suffers considerable burden and expense by having to rent space from another church in order to conduct its worship services, baptisms, weddings, confirmations, communions, and youth activities. Pl. Mem., pp. 8-9. However, a zoning code that merely restricts the location of religious practice and conduct does not substantially burden the free exercise of religion. *Vineyard*, 250 F. Supp. 2d at 986-87 (such "monetary and logistical burdens do not rise to the level of a substantial burden on [Petra's] constitutional free exercise rights"). Significantly, Petra can locate in two residential districts as of right and 16 additional districts

with a special permit, comprising approximately 70 percent of the Village's geographic area. Tr. 316. "[W]hen churches are permitted in some municipal zoning areas but not others, a congregation does not have a constitutional right to build its house or worship in any area it chooses." *Vineyard*, 250 F. Supp. 2d at 986.

Petra argues that the zoning code "unreasonably limits religious assemblies by relegating them to areas that are already built up and not suitable for large (100+) groups." Pl. Mem., p. 7, n.3; Pl. Post-Trial Mem., p. 14. But like many other cities in the Chicagoland area, Northbrook as a whole is largely developed. Tr. 450. Petra has not cited any cases suggesting that churches can locate wherever they want if a city does not have much vacant land available. And though Petra clearly spent a significant amount of time and money searching for a suitable property, retaining legal advice and applying for permits, there is no evidence that non-religious membership organizations would not face similar expenses as well. "Whatever specific difficulties [Petra] claims to have encountered, they are the same ones that face all rentors, not merely churches. The harsh reality of the marketplace sometimes dictates that certain facilities are not available to those who desire them." *C.L.U.B.*, 157 F. Supp. 2d at 915 (quoting *Love Church v. City of Evanston*, 896 F.2d 1082, 1086 (7th Cir. 1990)). *See also Civil Liberties*, 2003 WL 21977001, at *6 ("the scarcity of affordable land . . . along with the costs, procedural requirements, and inherent political aspects of the [zoning] approval processes . . . are incidental to any high-density urban land use . . . and do not amount to a substantial burden on religious exercise").

Petra speculates that it cannot find properties within the R-1 and R-2 districts which could accommodate its 175 congregants. Pl. Facts ¶¶73-75; Pl. Post-Trial Mem., p. 14.

19

However, it has not made a sufficient showing that it even looked for properties in such districts, or that it could not find suitable properties in any of the 18 other residential, commercial and office districts available by special permit. Nor has it presented evidence demonstrating that the mere fact that the church could not find a property the exact same size as 3005 MacArthur means that it has been unlawfully excluded from the Village. Poupard testified that the Village amended the zoning code in order to make it easier for churches to locate in Northbrook, not to burden religious practices. Tr. 326-28. Indeed, Petra's members concede that the Village has not prevented them from worshiping or interfered with the content of their religious practices in any way. Tr. 68-69, 70, 113. *See Civil Liberties*, 2003 WL 21977001, at *7 ("nothing in the record suggests, nor do Appellants articulate in anything but conclusory terms, that the object and purpose of the [zoning code] is anything other than those expressly stated therein"). At this stage of the proceedings, Petra has not demonstrated a reasonable likelihood of success on its free exercise claim.

### 4. RLUIPA

In addition to these constitutional arguments, Petra also claims that the Village's zoning code violates RLUIPA by excluding churches from the I-1 district and by treating them differently than non-religious organizations. The Village maintains that the statute has not been violated and that it is unconstitutional. Def. Mem., pp. 14-15. The Village moved to withdraw its constitutional objection to RLUIPA for purposes of preliminary injunction, but the Court need not reach that issue in any event because Petra has not made a sufficient showing that the zoning code violates the statute.

RLUIPA provides that:

> No government shall impose or implement a land use regulation in a manner that
> imposes a substantial burden on the religious exercise of a person, including a
> religious assembly or institution, unless the government demonstrates that
> imposition of the burden on that person, assembly, or institution –
>
> (A)     is in furtherance of a compelling governmental interest; and
> (B)     is the least restrictive means of furthering that compelling
>           governmental interest.

42 U.S.C. §2000cc(a)(1). Sections (b)(1) and (b)(3) of the statute further protect religious

assemblies and institutions from discrimination and exclusion, respectively. As a preliminary

matter, the Court notes that Petra has not cited a single case relating to RLUIPA or the proper

analysis of such claims. In addition, Petra argues a violation of Section (a) of the statute but does

not allege such a claim in its complaint, focusing instead on the Village's alleged violations of

Sections (b)(1) and (b)(3). Pl. Mem., p. 9. In any event, the Court first addresses whether Petra

has shown a substantial burden on its religious exercise.

Petra cannot demonstrate a reasonable likelihood of success on a Section (a) claim for the

same reasons it could not do so for its Free Exercise Clause claim. The Seventh Circuit recently

held that "in the context of RLUIPA's broad definition of religious exercise, a land-use

regulation that imposes a substantial burden on religious exercise is one that necessarily bears

direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively

impracticable." *Civil Liberties*, 2003 WL 21977001, at \*5. And as discussed earlier, the

difficulties encountered by Petra do not amount to a substantial burden on religious exercise.

Petra has continued to hold worship services and is allowed to locate in 18 of 24 districts in the

Village.

> Although [Petra] has undoubtedly suffered serious hardships, first in its attempt to
> find a suitable property, and, once it found one at [3005 MacArthur], in
> attempting to win approval for the intended uses, the court holds that the

21

[Northbrook] zoning ordinance does not constitute a substantial burden on the exercise of religion, and therefore Section (a)(1) has not been violated.

*Vineyard*, 250 F. Supp. 2d at 991-92.

Petra's equal treatment and exclusion claims suffer from similar deficiencies. Section (b)(1) of RLUIPA prohibits a government from treating religious assemblies or institutions on "less than equal terms with a nonreligious assembly or institution." Section (b)(3) states that a government may not "totally exclude" or "unreasonably limit" religious assemblies or institutions from a jurisdiction. These provisions codify existing Equal Protection Clause and Free Exercise Clause jurisprudence. *See Freedom Baptist Church of Delaware County v. Township of Middletown*, 204 F. Supp. 2d 857, 869 (E.D. Pa. 2002) (Sections (b)(1) and (b)(3) of RLUIPA "codify existing Supreme Court decisions under the Free Exercise and Establishment Clauses of the First Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment"); *Ventura County Christian High Sch. v. City of San Buenaventura*, 233 F. Supp. 2d 1241, 1246 (C.D. Cal. 2002).

As amended, the zoning code treats religious and non-religious membership organizations on equal terms by excluding both from the I-1 district. Petra claims that churches are treated less favorably than restaurants and bars, which are still allowed in the I-1 district. Pl. Post-Trial Mem., p. 11. However, all other non-religious membership organizations are also treated "less favorably" than restaurants and bars, and Petra has not cited any authority indicating either that restaurants and bars are "similarly situated" assembly uses or that this is sufficient to constitute a violation of RLUIPA. *See Ventura County Christian High Sch.*, 233 F. Supp. 2d at 1246-47 ("in evaluating plaintiffs claims under either RLUIPA or the Equal Protection Clause of

the Fourteenth Amendment, the Court must first inquire as to whether defendants have treated plaintiffs in an unequal manner to similarly situated entities").

As for the exclusion claim, Petra has not presented sufficient evidence that it is unreasonably limited in its ability to find property within the Village to accommodate its 175 congregants. Indeed, religious institutions are allowed as of right and by special permit in approximately 70 percent of Northbrook's area. Petra claims that the zoning code "contravenes Illinois law by requiring the applicant for a special use permit to prove that the proposed use is compatible in the district." Pl. Post-Trial Mem., p. 11. However, Poupard testified that the Village presumes a special use is valid, in accordance with Illinois law. Tr. 321-22, 331-32. *See, e.g., City of Chicago Heights v. Living Word Outreach Full Gospel Church and Ministries, Inc.,* 196 Ill.2d 1, 21, 749 N.E.2d 916, 929-31 (2001) ("[b]ecause special uses, as such, are considered compatible with other uses in the zoning district in which they are included, it is generally held that an application for a special use permit may not be denied on the ground that the use is not in harmony with the surrounding neighborhood").

Petra also claims that the zoning code improperly excludes churches from the Village by not allowing a property owner "ever to reapply for a special use permit if the Trustees have once denied its application, unless the property owner can prove changed circumstances." Pl. Post-Trial Mem., p. 11. Once again, Petra cites no authority indicating that such a provision, which applies to all property owners and not just churches, violates RLUIPA. *See, e.g.,* 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (RLUIPA "does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use

23

regulations, where available without discrimination or unfair delay"); *Civil Liberties*, 2003 WL 21977001, at *6 (RLUIPA does not require governments to favor religious land uses "in the form of an outright exemption from land-use regulations"). Moreover, Petra withdrew its application before the Village Board ever voted on it, and never once mentioned RLUIPA during that process or during the proceedings to amend the zoning code. And RLUIPA would constitute a changed circumstance allowing reconsideration of Petra's application. Tr. 548.

In sum, Petra has not demonstrated a substantial burden on its religious exercise, unequal treatment or unlawful exclusion from the Village. Thus, Petra has not shown a reasonable likelihood of success on any of its RLUIPA claims.

### 5. Vested Right

Petra claims that even if the 2003 Code is valid and constitutional, the congregation nonetheless has a vested right in obtaining the appropriate permits to use the Property as a church.[4] To establish a vested right to a zoning certificate, Petra must demonstrate that: (1) it made expenditures or incurred obligations "in good faith reliance on the probability that it would obtain a zoning certificate and a building permit pursuant to the current zoning ordinance"; and (2) those expenditures and obligations were substantial. *1350 Lake Shore Associates v. Mazur-Berg*, 339 Ill. App. 3d 618, 791 N.E.2d 60, 73 (2003). "A probability that approval is forthcoming exists when the property at issue is zoned to permit the use requested by the

---

[4]     Petra claims that "[i]t may be inferred that Illinois' vested rights doctrine is grounded in the Due Process Clause of the United States Constitution and the Illinois Constitution," relying on a 1927 New York state case, which is cited in a 1958 Illinois Supreme Court case that nowhere mentions either constitution. Pl. Post-Trial Mem., p. 12. The Court disagrees that any such inference can be drawn from these cases, and Petra's discussion of this claim does not include any due process analysis. Thus, the Court will analyze the vested rights claim as a state law theory of relief.

landowner." *Id.* (quoting *Bank of Waukegan v. Village of Vernon Hills*, 254 Ill. App. 3d 24, 31, 626 N.E.2d 245 (1993)). *See also People ex rel. Shell Oil Co. v. Town of Cicero*, 11 Ill. App. 3d 900, 905, 298 N.E.2d 9, 12 (1973) ("a 'probability' that a building permit will issue is present where the subject site . . . is suitably zoned to permit construction of the type of building and use thereof contemplated by the party"). However, "expenses which a property owner incurs with knowledge that an amendatory ordinance, pursuant to which the intended use would not be permitted, is pending, are not incurred in good faith reliance on the probability that a zoning certificate . . . will issue." *1350 Lake Shore Associates*, 791 N.E.2d at 74.

Petra's primary argument in support of its vested rights claim is that the 1988 Code's prohibition of religious uses in the I-1 district was "null and void" and that Petra "was authorized to use its property as a church, and it could make its substantial expenditures in reasonable expectation of getting a building permit." Pl. Post-Trial Mem., p. 5. But once again, Petra does not cite a single case in support of this assertion. *See Pacific Tall Ships*, 102 F. Supp. 2d at 924-25 ("we address only those [arguments] that are fully developed and supported by relevant case law"); *LINC Finance Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997) ("[t]his court has no duty to research and construct legal arguments available to a party") (citation omitted). As explained earlier, Petra's singular reliance on *Carter* is misplaced because that case merely held that where a city failed to follow statutory procedures required to enact a zoning ordinance, it was null and void. 773 F.2d at 254. Here, Petra makes the novel and unsupported assertion that a zoning provision it believes is unconstitutional is automatically void absent any legal determination to that effect.

Petra has arguably made substantial expenditures with respect to the Property, but it has failed to show that such expenditures were made in good faith reliance on the probability of obtaining the appropriate permits. "The vested rights doctrine is grounded in the desire to avoid the 'grave injustice' of allowing municipal officials to deny development rights by changing the rules in the middle of the game." *International College of Surgeons v. City of Chicago*, Nos. 91 C 1587, 91 C 5564, 1995 WL 9243, at *19 (N.D. Ill. Jan. 9, 1995). Here, Petra knew that the Property was never zoned to permit its requested use, and it knew that the Board likely was going to deny its request for rezoning before it even purchased the Property. Indeed, Petra could not have reasonably believed that it would obtain rezoning when it withdrew its rezoning application before the Board ever voted on it.

Contrary to Petra's assertion, the mere fact that it filed this lawsuit challenging the zoning code does not demonstrate a probability of obtaining rezoning or building permits, or Petra's good faith reliance on any such probability. Pl. Post-Trial Mem., pp. 4-5. At best, it demonstrates an unresolved question as to permitted uses in the I-1 district as of the date the lawsuit was filed. *See, e.g., International College of Surgeons*, 1995 WL 9243, at *19 (vested rights doctrine does not apply "where there is an unresolved question over what may be built under the land-use regulations"). Significantly, Petra never raised any constitutional or statutory objections during its zoning application process, and never went back to the Board for a final determination on its application after filing the lawsuit.

Petra has not shown any grave injustice sufficient to apply the vested rights rule and, thus, it has not met its burden of showing a reasonable likelihood of success on this claim. *Bank of*

*Waukegan*, 254 Ill. App. 3d at 33, 626 N.E.2d at 252 ("the rationale behind the vested rights rule [is] preventing grave injustice").

### 6. Legal, Nonconforming Use

For similar reasons, Petra has not shown a reasonable likelihood of success on its claim that the congregation is entitled to use the Property as a church because "the Church's religious exercise at 3005 MacArthur has become, at the least, a legal nonconforming use, which may not be abrogated." Pl. Mem., p. 11. "A legal nonconforming use is a use that is not permitted under the current zoning ordinance but is allowed to continue because it predates the ordinance." *City of Marengo v. Pollack*, 335 Ill. App. 3d 981, 986, 782 N.E.2d 913, 917 (2002). "[A] use that was not lawful at its inception is not a legal nonconforming use and therefore may be eliminated if it violates the current zoning ordinances." *Id.*

The Village argues that Petra cannot establish a legal, nonconforming use of the Property because it never actually used the Property for religious assembly. Def. Mem., pp. 10-11; Def. Post-Trial Mem., pp. 6-7. Generally, "an owner is entitled to the protection of a legal nonconforming use if the property is in actual use, as distinguished from a merely contemplated use, when the zoning restriction becomes effective." *Bainter v. Village of Algonquin*, 285 Ill. App. 3d 745, 751, 675 N.E.2d 120, 125 (1996) (citing *DuPage County v. Elmhurst-Chicago Stone Co.*, 18 Ill.2d 479, 484, 165 N.E.2d 310, 313 (1960)). In this case, Deacon Lee, Pastor Kim and Elder Kim all testified that Petra has been using 3005 MacArthur for prayer meetings, bible studies and choir practices since it closed on the property in October 2001. Tr. 49-51, 52-53, 90-93, 94-95, 166-68, 185. For purposes of this motion for preliminary injunction, Petra has sufficiently demonstrated actual use of the Property for religious assembly.

27

The Village next argues that Petra failed to exhaust its administrative remedies with respect to the Village because it withdrew its zoning application prior to a final Board decision. Def. Mem., pp. 12-13; Def. Post-Trial Mem., pp. 8-10. To the extent Petra is challenging the facial validity of the zoning code, however, it is not required to exhaust its administrative remedies. *See Van Harken v. City of Chicago*, 305 Ill. App. 3d 972, 977, 713 N.E.2d 754, 758 (1999) ("if the complaint attacks the constitutionality of a statute or ordinance on its face, the plaintiff need not exhaust all of his administrative remedies before seeking judicial relief"); *Zebulon Enterprises, Inc. v. DuPage County*, 146 Ill. App. 3d 515, 520, 496 N.E.2d 1256, 1259 (1986) ("[t]he exhaustion requirement is inapplicable . . . where the property owner challenges the constitutionality of the ordinance on its face or in its terms").

More problematic for Petra is the fact that its use of the Property for religious assembly did not predate the 1988 Code and was never permitted under that code. As noted earlier, Petra has cited no competent authority for its proposition that the zoning code's prohibition of religious uses in the I-1 district was "null and void" or that its use of the Property for religious purposes was automatically "legal" absent any judicial determination to that effect. Pl. Mem., pp. 5, 11; Pl. Post-Trial Mem., pp. 6, 7. *See, e.g., Forest Preserve Dist. of DuPage County v. Brown Family Trust*, 323 Ill. App. 3d 686, 692, 753 N.E.2d 1110, 1115 (2001) ("an ordinance is presumed valid and . . . the burden of establishing invalidity rests upon those who challenge the ordinance"); *Lovers Lane & Co. v. Village of Libertyville*, 128 F. Supp. 2d 1126, 1127 (N.D. Ill. 2000) ("[i]n general, a zoning ordinance is presumed to be constitutionally valid").

Petra never sought a permit to conduct meetings, youth groups, choir practices or any other organizational activity that was arguably allowed in the I-1 district under the 1988 Code,

though such a permit was required of all membership organizations. Nor did Petra ever attempt to obtain the necessary building code permits for such uses. And as noted, Petra knew when it bought the Property in October 2001 that its proposed use was not allowed in the I-1 district, and it withdrew its rezoning application without ever mentioning any constitutional or statutory concerns. For purposes of preliminary injunction, Petra has not demonstrated a reasonable likelihood of success in establishing a legal, nonconforming use of the Property. *See Lake County v. Zenko*, 174 Ill. App. 3d 54, 65-66, 528 N.E.2d 414, 421 (1988) ("the burden of proving that [its] use of property fell within the exception to the application of the zoning ordinance for legal nonconforming uses was [Petra's] burden"); *City of Chicago v. Westphalen*, 95 Ill. App. 2d 331, 338, 238 N.E.2d 225 (1968) ("[a] party wishing to benefit by an exception must prove that he comes within it").

**B.      Irreparable Harm/Inadequate Remedy at Law**

Having determined that Petra presented insufficient evidence of a reasonable likelihood of success on the merits of its constitutional, statutory and state law claims, the Court need not address the remaining factors in the preliminary injunction test. *Clemens v. Peters*, 69 F.3d 539 (7th Cir. 1995) (citing *Curtis v. Thompson*, 840 F.2d 1291, 1297 (7th Cir. 1988)) ("[t]he denial of a motion for a preliminary injunction may be based solely on plaintiff's failure to establish a negligible chance of success on the merits"). Nevertheless, the Court notes that Petra has failed to meet its burden of establishing irreparable harm or an inadequate remedy at law.

Irreparable harm is harm that cannot be compensated by money damages. *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) ("the injury must be of a particular nature, so that compensation in money cannot atone for it") (internal quotations omitted). Petra's

only argument in support of this requirement is that the deprivation of a constitutional right, even if temporary, constitutes irreparable harm. Pl. Mem., p. 13 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Given that Petra has failed to establish a reasonable likelihood of success on any of its constitutional or statutory claims, it has also not shown any irreparable harm to support a preliminary injunction.

## CONCLUSION

For the reasons stated above, Petra's motion for preliminary injunction (Docket Entry #3-2) should be denied. In addition, The Village's Motion to Withdraw Constitutionality Challenge Without Prejudice (Docket Entry #17-1) should be denied as moot, and Petra's motion to have the Court drive by the Property (Docket Entry #13-1) should also be denied.

Counsel has ten days from the date of service of this Court's Report and Recommendation to file objections with the Honorable Blanche M. Manning. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. §636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327 (7th Cir. 1995).

_____
NAN R. NOLAN
United States Magistrate Judge

Dated: August 28, 2003

30